**ST. PAUL FIRE & MARINE INSURANCE CO., Subrogee of Wellen Oil Co., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 264–82L.**

United States Claims Court.

March 22, 1984.

---

Allan Maitlin, West Orange, N.J., with whom were Feuerstein, Sachs, Maitlin, Rosenstein & Flemming, West Orange, N.J., for plaintiff.

Michael W. Steinberg, Washington, D.C., with whom were Asst. Atty. Gen. F. Henry Habicht, II and Jose R. Allen, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

After the parties filed a stipulation for dismissal with prejudice, defendant, the United States, moved for an award of attorney's fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(b) (Supp. V 1981).

### Facts

Plaintiff sued under the Federal Water Pollution Control Act, 33 U.S.C. § 1321(i)(1) (1976), to recover $1.2 million in oil cleanup costs. The complaint was filed on May 25, 1982, one day before the statute of limitations would have expired. Defendant responded within its allotted 60 days, simultaneously serving upon plaintiff a set of interrogatories that became the source of significant difficulty. That difficulty and its aftermath is described in greater detail in an earlier order. *Wellen Oil Co. v. United States*, 1 Cl.Ct. 98 (1982). It suffices to say here that the court imposed two sets of monetary sanctions on plaintiff and its attorney on the basis of a record "replete with instances of delay, failures to respond to motions, and ambiguous or un-

satisfactory explanations." *Id.* at 100. The court also dismissed the case on the ground that it had been brought in the name of a party (the oil company) that counsel was not authorized to represent. *Id.*

Plaintiff moved for reconsideration of the dismissal and the court granted the motion on February 14, 1983, on the condition that plaintiff promptly file an amended complaint naming St. Paul Fire & Marine Insurance Company (the real party in interest) as the plaintiff. Plaintiff did so on March 2, 1983, and defendant filed its amended answer on the same day.

Pursuant to the court's standard Order Governing Proceedings Before Trial (OGPBT), filed in this case on February 28, 1983, the parties had until May 2, 1983, to complete discovery; the court extended that period to June 28, 1983. The court then scheduled a pretrial conference for August 16 and trial for September 19, 1983. One day before the pretrial conference the parties filed a stipulation of dismissal with prejudice. Ten days later defendant filed its application for attorney's fees.

### Position of the Parties

Defendant argues that under *Ellis v. United States*, 711 F.2d 1571 (Fed.Cir. 1983), the court is empowered to entertain an EAJA application because this is a "transitional" case originally filed in the Court of Claims and transferred to this court by the Federal Courts Improvement Act. Defendant asserts that it is entitled to fees under subsection (b) of section 2412 because plaintiff has prosecuted this action in bad faith. In defendant's view, plaintiff never had any chance of recovery and must have brought suit merely to extract a nuisance settlement. Defendant requests $15,000 based on over 200 hours of work at $75 per hour.

Plaintiff argues that the EAJA does not authorize an award of attorney's fees to the United States, but only to private litigants. Plaintiff also contends that defendant is precluded from seeking attorney's fees because it is not the prevailing party and because the stipulation of dismissal does not reserve it that right. Finally, plaintiff argues that it brought and maintained the action in good faith and therefore does not deserve to be penalized by the imposition of sanctions.

### Discussion

#### A. *Jurisdiction*

■ 1. Defendant errs in arguing that this is a "transitional" case and that the court therefore may entertain an EAJA application under the rationale of *Ellis*. As Judge Mayer correctly noted in *Bregstone v. United States*, 4 Cl.Ct. 507, 511 (1984), *Ellis* only applies where the EAJA application was filed while the case was before the Court of Claims. Nor is this case controlled by *Morris Mechanical Enterprises, Inc. v. United States*, 728 F.2d 497, 498–99 (Fed.Cir.1984), which involved an EAJA application filed after the case was transferred to the Claims Court from the Court of Claims. In *Morris Mechanical Enterprises* virtually all of the proceedings in the substantive portion of the case had been completed in the Court of Claims. *Id.* at 498. By contrast, virtually all proceedings in this case took place in the Claims Court.

Nevertheless, on the basis of the rationale first enunciated by Judge Wood in *Bailey v. United States*, 1 Cl.Ct. 69, 71–74, *vacated in part on other grounds and remanded*, 721 F.2d 357 (Fed.Cir.1983), and since adopted by every other judge who has considered the matter, *see, e.g., Essex Electro Engineers, Inc. v. United States*, 4 Cl.Ct. 463, 465 (1984); *Greenberg v. United States*, 1 Cl.Ct. 406, 407 (1983), the court concludes that it has jurisdiction to entertain all applications for costs and attorney's fees under the EAJA.

■ 2. Plaintiff's argument that an EAJA application cannot be brought on behalf of the United States is refuted by the plain language of the statute. Section 2412 is divided into four principal subsections, three of which—(a), (b) and (d)—provide for payment of costs and/or attorney's fees in certain circumstances. Subsection (a) provides that costs of litigation may be awarded *"to the prevailing party* in any

civil action brought by or against the United States" (emphasis added). An identical provision in subsection (b) governs the award of "reasonable fees and expenses of attorneys;" such fees may be awarded to the extent permitted by the common law or by statute. By significant contrast, subsection (d) provides for the award of fees and other expenses only "to a prevailing party *other than the United States*" (emphasis added).

The language and structure of these three subsections is open to only one interpretation: Costs and attorney's fees may be awarded to *any* prevailing party (including the United States) under subsections (a) and (b), while awards under subsection (d) are limited to prevailing parties other than the United States. The contrasting language of subsections (a) and (b) on the one hand and subsection (d) on the other cannot be construed in any other way.

 It is clear, moreover, that the court may award costs and attorney's fees to the United States quite aside from the EAJA. As a litigant, the government needs no special authorization to seek costs or fees from an opposing party when circumstances warrant such an award. *See, e.g., Copeland v. Martinez,* 603 F.2d 981, 987 (D.C.Cir.1979), *cert. denied,* 444 U.S. 1044, 100 S.Ct. 730, 62 L.Ed.2d 729 (1980); *Parker v. Boorstin,* No. 82–1348, slip op. at 2 (D.D.C. July 11, 1983); *see also Moon v. Smith,* 523 F.Supp. 1332 (E.D.Va.1981) (federal government may benefit from the bad faith exception to the American Rule). The reverse is not true; monetary awards can be imposed on the United States only when there has been an express waiver of sovereign immunity. *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 20, 47 S.Ct. 1, 8, 71 L.Ed. 131 (1926) (costs cannot be awarded against the government absent express waiver of sovereign immunity; *United States v. N.Y. Rayon Importing Co.,* 329 U.S. 654, 658–59, 67 S.Ct. 601, 603–04, 91 L.Ed. 577 (1947) (explicit waiver of immunity required for award of interest on claim against government); *cf. United States v. Mitchell,* 463 U.S. ___,

___, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983) (government immune from suit except insofar as it has expressly consented).

Section 2412 was first enacted in 1966 in order to partially correct this imbalance. The section was intended to put private litigants and the United States "on an equal footing as regards the award of court costs to the prevailing party in litigation involving the Government." S.Rep. No. 1329, 89th Cong., 2d Sess. 2, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2527, 2528. This made it possible to award costs (but not attorney's fees) to "either the private litigant or the Government." *Id. See, e.g., Baez v. United States Dep't of Justice,* 684 F.2d 999, 1006 (D.C.Cir. 1982).

When section 2412 was amended in 1980 with the passage of the Equal Access to Justice Act, Pub.L. No. 96–481, Title II, 94 Stat. 2321, 2325 (1980), Congress took a further step toward "placing the Federal Government and civil litigants on a completely equal footing." H.R. No. 1418, 96th Cong., 2d Sess. 9, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4953, 4984, 4987. The EAJA added section 2412(b)—a waiver of sovereign immunity with regard to attorney's fees. There is absolutely no indication that this subsection was intended to diminish the authority of the United States to recover attorney's fees under the established rules of the common law; on the contrary, the provision clearly codifies that authority. The court therefore concludes that it may consider defendant's attorney's fees application. *Accord Bregstone,* 4 Cl.Ct. at 512.

B. *The Effect of the Stipulation of Dismissal*

 1. Plaintiff argues that "defendant ... cannot be considered a prevailing party since it consented to the voluntary dismissal as an agreement between the parties that without either party acknowledging responsibility of any kind, the matter was being dismissed with prejudice." Plaintiff's Brief in Opposition 5–6. This argu-

ment is unpersuasive. A dismissal with prejudice is a full adjudication of the case in favor of the defendant; absent a counterclaim, it is the best possible result a defendant could hope for. *See Bregstone v. United States,* 1 Cl.Ct. 786, 788 (1983); *Smoot v. Fox,* 340 F.2d 301, 303 (6th Cir. 1964); *see generally* 10 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2667 (1983) ("a dismissal of the action, whether on the merits or not, generally means that defendant is the prevailing party").

■ A stipulation of dismissal can, of course, be occasioned by the payment of money or some other concession not reflected on the record. In such a case, there may be a legitimate question as to who is the prevailing party. Here, however, counsel represents without contradiction that defendant made no concession whatever to induce plaintiff to dismiss the action. Under such circumstances, the stipulation of dismissal establishes that defendant is the prevailing party in the litigation.

■ 2. Plaintiff also argues that defendant is precluded from seeking an award of attorney's fees because the stipulation of dismissal did not specifically reserve it that right. Plaintiff's argument stands reality on its head. Defendant's right to apply for attorney's fees and costs was not created by private agreement but stems from the common law as amplified by an Act of Congress. *See* pp. 765–766 *supra.* Any agreement between the parties must be shown to waive or relinquish such a right, not to establish or preserve it. Silence in the stipulation of dismissal serves only to leave preexisting rights intact because waiver of such rights cannot be inferred from a failure to address the subject. *See McKinney v. United States,* 403 F.2d 57, 59 (5th Cir.1968) (waiver of a federal right must be clearly established); *Kahn v. Lumbermens Mutual Casualty Co.,* 293 F.Supp. 985, 989 (E.D.N.Y.1968) ("cases are legion to the effect that silence does not constitute a waiver"); *see also* 92 C.J.S. *Waiver* 1065 (1955) (silence is never a waiver where there is no duty to speak).

In any case, plaintiff cannot claim to be surprised by the attorney's fees application. Defense counsel represents without contradiction that on July 29, 1983, he wrote to plaintiff's counsel alerting him of defendant's intention to apply to the court for fees and costs. Plaintiff could well have conditioned the dismissal on defendant's agreement to forego such an application. Under such circumstances, silence in the stipulation of dismissal bespeaks an understanding that the issue of attorney's fees would be left for resolution by the court.

### C. *Defendant's Entitlement to Attorney's Fees*

■ 1. In *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court noted that parties to litigation normally bear the costs of their own legal representation; this is known as the American Rule. The Court also recognized, however, that there are established exceptions to this rule, stemming from a court's inherent power to control the process of litigation before it. *Id.* at 257–59, 95 S.Ct. at 1621–22. Among these exceptions is the situation where a party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). Defendant grounds its fee application on this bad faith exception.

To determine whether plaintiff has acted vexatiously, wantonly or in bad faith, it is first necessary to examine plaintiff's claim and the proof it would have needed to prevail. The court must then assess whether plaintiff's prosecution of the case was reasonably calculated to yield a victory or at least result in the presentation of a colorable case at trial.

■ 2. As noted, this is an action for the recovery of oil spill cleanup costs. At the time the complaint was filed there was significant precedent governing the standard for recovery in such cases. *See,*

*e.g, Reliance Insurance Co. v. United States,* 230 Ct.Cl. 390, 393–94, 677 F.2d 844, 848 (1982); *Union Petroleum Corp. v. United States,* 651 F.2d 734, 228 Ct.Cl. 54, 67 (1981); *Shell Pipe Line Corp. v. United States,* 578 F.2d 1389, 216 Ct.Cl. 411 (1978) (order adopting recommended decision), 11 Env't Rep.Cas. (BNA) 1385 (Ct.Cl.1978) (decision reprinted in its entirety). These cases teach that a plaintiff must carry an extraordinarily heavy burden to recover cleanup costs from the United States. To prevail, a discharger must establish that the spill was entirely the result of one or more of the following four causes deemed to be completely outside its control: (a) an act of God; (b) an act of war; (c) the negligence of the United States; (d) an act or omission of a third party. A discharger will be precluded from recovering if it is at fault in any way, particularly insofar as it failed to take reasonable precautions to prevent the spill. *United States v. Bear Marine Services,* 509 F.Supp. 710, 715 (E.D.La.1980) ("[t]he discharger must be totally free of fault"); S.Rep. No. 351, 91st Cong., 1st Sess. 6 (1969). Indeed, *any* contributory acts on the discharger's part, including those that are entirely innocent, will preclude recovery. *Reliance Insurance Co.,* 230 Cl.Ct. at 394, 677 F.2d at 848–49.

3. The oil spill here in question occurred in 1976 when one of Wellen Oil Co.'s storage tanks ruptured; the oil broke through a retaining wall into a river. In its original as well as its amended complaint plaintiff alleged that the rupture of the oil tank "was caused solely by an act of God or an act or omission of a third party or a combination of the foregoing." Complaint ¶ 4; Amended Complaint ¶ 6.

■ During discovery, plaintiff produced an engineering report prepared in connection with prior litigation involving the same incident. The report concluded that "the tank failure was due to severe differential settlement of the sub-structure below the tank floor plates" and that such settlement was entirely foreseeable when the tank was erected. Our precedents clearly establish that such soil settlement is not an act of God within the meaning of 33 U.S.C. § 1321(i)(1)(a). *See Sabine Towing & Transportation Co. v. United States,* 666 F.2d 561, 229 Ct.Cl. 265, 269–70 (1981). Plaintiff has suggested no other act of God that might have been responsible.

■ Plaintiff's only hope for recovery, then, lay in establishing that the spill was caused entirely by a third party. During the course of discovery, plaintiff identified three candidates: the company that had constructed the ruptured tank, the company that had graded the land on which the tank was erected, and the individual who had prepared the oil spill prevention plan. It is quite clear, however, that establishing the culpability of these three parties would not have helped plaintiff at all but, in fact, would have destroyed its case. It was, after all, the responsibility of the oil company to assure that its tank was soundly constructed, that the soil beneath was properly graded and packed, and that its spill prevention plan was effective. Having chosen to delegate that responsibility, it cannot now recover cleanup costs from the United States by arguing that its surrogates acted negligently. Such surrogates are simply not considered third parties under the terms of the statute. *United States v. LeBeouf Brothers Towing Co.,* 621 F.2d 787, 789–90 (5th Cir.1980), *cert. denied,* 452 U.S. 906, 101 S.Ct. 1031, 69 L.Ed.2d 406 (1982); *Burgess v. M/V Tamano,* 564 F.2d 964, 982 (1st Cir.1977), *cert. denied,* 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978). Indeed, the negligence of such parties would be imputed to the oil company, eliminating any possibility of recovery. *See Burgess,* 564 F.2d at 982; *Shell Pipe Line Corp.,* 11 Env't Rep.Cas. (BNA) at 1389.

In addition, according to the engineering report, Wellen Oil should have foreseen that the soil under the tank would settle, creating the risk of rupture. Nevertheless, it continued to store oil in the tank and did nothing to correct the problem. Under our precedents, that alone constitutes sufficient fault to preclude recovery, regardless of

who was principally responsible for the rupture. *See, e.g., Atlantic Richfield Co. v. United States,* 1 Cl.Ct. 261, 263–64 (1982) (owner should have foreseen risk of parking tank truck where containment measures were inadequate); *Shell Pipe Line Corp.,* 11 Env't Rep.Cas. (BNA) at 1389 (pipeline owner should have been aware of factors indicating potential rupture).

The long and short of it is that facts in plaintiff's possession when it filed the complaint conclusively defeated *any* theory of recovery. The engineering report had been in plaintiff's possession for five years, giving it ample time to investigate further the circumstances surrounding the spill or obtain the views of other experts as to its cause. It did neither. Instead, plaintiff waited until the statute of limitations had almost expired,[1] then filed a complaint containing key allegations unsubstantiated by the facts in its possession. This alone would support a finding of bad faith. *See, e.g., Callow v. Amerace Corp.,* 681 F.2d 1242, 1243 (9th Cir.1982); *In re National Student Marketing Litigation,* 78 F.R.D. 726, 729 (D.D.C.1978), *aff'd sub nom. Lipsig v. National Student Marketing Corp.,* 663 F.2d 178 (D.C.Cir.1980). But there is more.

After filing the complaint, plaintiff showered the case with disinterest. As best the court can tell, plaintiff made no attempt to discover additional facts or to develop any novel legal theory to bolster its woefully thin case. Indeed, as far as the court is aware, plaintiff's only affirmative act in preparation for trial was to send out seven interrogatories designed to learn defendant's strategy.

Moreover, plaintiff consistently refused to cooperate with opposing counsel or comply with the court's deadlines and other procedures. Even after such conduct cost it two sets of sanctions, *see* pp. 1–2 *supra,* plaintiff failed to mend its ways. For example, the court's procedural order required that counsel meet (in person or by telephone) *no later than mid-July* to prepare a stipulation and cooperate in the preparation of other pretrial submissions. OGPBT ¶ VI(b). Defense counsel represents without contradiction that as early as May 20, 1983, he mailed a proposed stipulation to plaintiff's attorney and thereafter repeatedly attempted to elicit a reaction. Plaintiff's only response was a terse letter on June 28 stating that it would be unable to take any action on the proposed stipulation *until mid-August* and suggesting that defendant make an offer of settlement. Plaintiff did not file a motion requesting that the court extend the time for complying with paragraph VI(b) of the OGPBT. Indeed, plaintiff has offered no explanation or excuse for its unilateral decision to ignore the court's procedural order.

Finally, plaintiff's decision to dismiss was ill timed to support its contention that the action was prosecuted in good faith. Plaintiff announced its decision on August 5, six weeks before trial, less than two weeks before the pretrial conference and only four days before the parties were required to file substantial pretrial submissions.[2] By that time the lawsuit had been pending for some 14 months but, from all appearances, plaintiff's case had advanced

---

1. This unexplained delay presumptively prejudiced the defense, raising the strong likelihood that plaintiff's claim was barred by laches. *Brundage v. United States,* 504 F.2d 1382, 205 Ct.Cl. 502, 505–06 (1974), *cert. denied,* 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975) (the elements of a laches defense are unreasonable delay in bringing suit and resulting prejudice to defendant); *Cason v. United States,* 471 F.2d 1225, 200 Ct.Cl. 424, 431 (1973) (burden of proving lack of prejudice shifts to plaintiff as period of delay increases); *accord Crispino v. United States,* 3 Cl.Ct. 306, 311 (1983); *Fleming v. United States,* 2 Cl.Ct. 111, 115 (1983); *see also*

*Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734 at 741–742 (Fed.Cir.1984) (laches defense applicable to patent infringement action); *National Ass'n of Broadcasters v. FCC,* 554 F.2d 1118, 1128 & n. 27 (D.C.Cir.1976) (laches defense applicable to claim for refund of fees collected by agency).

2. Under paragraph VI of the OGPBT each party was required to prepare a number of documents, including a memorandum of fact and law presenting its theory of the case and the facts it expected to prove at trial.

little or not at all toward trial. Plaintiff's decision to drop the case four days before it was required to submit a blueprint of its trial strategy strongly suggests that plaintiff had no such strategy because it never intended to go to trial. Despite three opportunities to inform the court otherwise, plaintiff has utterly failed to describe its actions in preparation for trial or to explain why it thought it had a prayer of winning. Instead, plaintiff has offered only meaningless generalities.[3]

4. Plaintiff's conduct appears to have been calculated to impose substantial litigation costs upon defendant while keeping plaintiff's own expenses at a minimum. Plaintiff waited until the statute of limitations had almost expired before filing its complaint, rendering defense of the action more difficult and expensive. *See* n. 1 *supra*. It then cooperated only grudgingly with defendant's efforts to prepare for trial while doing little or nothing to prepare its own case. When plaintiff could no longer avoid the expense of significant, productive work, it threw in the towel. The inference that plaintiff brought the action solely to extract a nuisance settlement is strong.

■ Even if the court were to give plaintiff the benefit of every doubt and assume that it brought the action hoping to win, sanctions would nevertheless be appropriate. It is now settled that a plaintiff must research the law before bringing suit to determine whether it can make a reasonable, good faith argument for recovery. Moreover, a party must discontinue an action as soon as it becomes aware (or should have become aware) that it has no chance of winning. *Nemeroff v. Abelson*, 704 F.2d 652, 659–60 (2d Cir.1983); *Davidson v. Allis-Chalmers Corp.*, 567 F.Supp. 1532, 1539–40 (W.D.Mo.1983); *see Perichak v. International Union of Electrical Radio*

*& Machine Workers, Local 601*, 715 F.2d 78, 83–84 & n. 8 (3d Cir.1983); *Bregstone*, 4 Cl.Ct. at 514; *Philips Business Systems, Inc. v. Executive Business Systems*, 570 F.Supp. 1343, 1350 (E.D.N.Y.1983); *Black Musicians of Pittsburgh v. Local 60–471, American Federation of Musicians*, 442 F.Supp. 855, 856 (D.Pa.1977).

■ Here, plaintiff could have entertained no reasonable expectation of winning on the basis of the facts available to it when it filed the complaint. Moreover, it did virtually no discovery, so its likelihood of success was no greater 14 months later when it decided to drop the case. For plaintiff to sit by and let defendant expend 200 hours of legal time before it deigned to take a hard look at its case and assess its prospects was highly irresponsible. That hard look should have been taken much earlier. Plaintiff's failure to give the case serious attention until the trial drew near, with the full knowledge that defendant's counsel was expending valuable time and resources, is as much an abuse of the judicial process as the prosecution of a nuisance action.

In earlier times, conduct such as plaintiff's might have been overlooked. However, the litigation explosion has forced a change in judicial attitudes. The demands upon the courts are too great, and the expenses inflicted on opposing parties are too high, to allow a litigant its day in court even if its position is entirely frivolous. *See generally Connell v. Sears Roebuck & Co.*, 722 F.2d 1542, 1553–55 (Fed.Cir.1983). When lawsuits are brought or maintained irresponsibly or for improper reasons, courts no longer hesitate to impose a variety of sanctions—including the payment of costs and attorney's fees—upon the offending party, its attorney or both. *See, e.g., In re Complaint of Judicial Misconduct,*

---

**3.** For example, plaintiff has argued that "[t]here is nothing to indicate that this action was brought in bad faith," Plaintiff's Brief in Opposition 6; and that "a party is not to be penalized for maintaining an aggressive litigation posture," Plaintiff's Reply Brief 8–9; and further that "there is nothing in the record to demonstrate that this plaintiff in any way engaged in

dilatory tactics or conducted itself other than as required in order to obtain the relief to which it thought it was entitled." Plaintiff's Response to Defendant's Statement of Supplemental Authority 4. Such generalities cannot assist the court in determining whether the action was brought or maintained in good faith.

*No. 1*, 2 Cl.Ct. 255, 258–62 (1983). This trend has had the active support of the Chief Justice, *see* W. Burger, Annual Message on the Administration of Justice at the Midyear Meeting, American Bar Association 9–11 (Feb. 12, 1984), and of the Court of Appeals for the Federal Circuit. *See, e.g., Wright v. United States*, 728 F.2d 1459, 1460 (Fed.Cir.1984) (damages and double costs awarded on court's own motion); *Beachboard v. United States*, 727 F.2d 1092, 1094–95 (Fed.Cir.1984) (costs and damages awarded against plaintiff who brought patently frivolous appeal). On the basis of the circumstances discussed above, the imposition of sanctions in this case is entirely appropriate.

#### D. *The Amount of Defendant's Award*

1. Attorney's fees awarded under section 2412(b) must be reasonable. *See, e.g., Aero Corp. v. Department of the Navy*, 558 F.Supp. 404, 429–30 (D.D.C. 1983). This is the traditional measure for awards under the bad faith exception to the American Rule. *See, e.g., Copeland v. Martinez*, 603 F.2d 981, 983 (D.C.Cir.1979); *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1089 (2d Cir.1977). The amount of the award is generally determined by considering a number of factors, the most important of which are the hours expended and the claimed hourly rate. *See Hensley v. Eckerhart*, 461 U.S. ——, ——, 103 S.Ct. 1933, 1939–40 & n. 9, 76 L.Ed.2d 40 (1983); *Everett Plywood Corp. v. United States*, 3 Cl.Ct. 705, 712–13 (1983); *Photo Data, Inc. v. Sawyer*, 533 F.Supp. 348, 352 (D.D.C. 1982) (any fee-setting inquiry begins with the multiplication of the reasonable number of hours by a reasonable hourly rate).

2. In an affidavit attached to the application for attorney's fees, defense counsel rather summarily asserts that he "devoted over 200 hours to the defense of this civil action." He then lists 18 items on which he claims to have spent time, not including the attorney's fees application. Counsel does not provide timesheets, does not represent that he maintained any contemporaneous time records and does not specify how much time he spent on each of the 18 items.

Such a showing is, as a general rule, inadequate to support an award of attorney's fees. *See, e.g., White v. City of Richmond*, 713 F.2d 458, 461 (9th Cir.1983) (court should not award attorney's fees without sufficiently detailed records). Without some contemporaneous record of time expended, the court and plaintiff have to trust defense counsel's word and memory for the facts alleged. Moreover, absent an itemized statement, the court is unable to determine whether the hours claimed are reasonable for any individual item.

Despite these shortcomings, the court will not deny defendant's application in this case. In the first place, plaintiff has raised no objection to the amount of time claimed by defendant. Second, where the award of attorney's fees is punitive rather than strictly compensatory, the court has discretion to make an award even absent a specific showing. *See Copeland*, 603 F.2d at 984, 992 & n. 69 (purpose of fee award under the bad faith exception is to deter harassment and protect integrity of judicial system). Finally, awards of attorney's fees in this court and its predecessor have been rare. Defendant therefore had little notice as to what records would be required. In the future, however, the court will reject any fee application not supported by adequate documentation.

[19] The court has examined the amount of time claimed by defendant and does not find it unreasonable. Preparation for trial in a case involving a claim for $1.2 million could easily take 200 hours, particularly where opposing counsel has been recalcitrant and significant time was wasted on procedural wrangling. Nevertheless, the lack of a specific, detailed record raises the possibility that defense counsel might have spent an unreasonable amount of time on some items or that his recollection as to the time spent might be in error. To avoid the possibility of overcompensation, the court therefore reduces the claimed time

from 200 to 150 hours. *See Hensley v. Eckerhart*, 461 U.S. at ——, 103 S.Ct. at 1939 (court may reduce award where party seeking fees submits inadequate evidence).

3. Defendant asks for $75 an hour, a rate that plaintiff has not challenged. In support of that rate, counsel represents that he graduated in 1977 from the University of Pennsylvania Law School where he was an editor of the *University of Pennsylvania Law Review*. After graduation, he served as a law clerk to a federal district judge and then joined the Washington, D.C., office of a respected national law firm. While at the firm, defense counsel was engaged in environmental litigation and at the time of his departure, three years later, was billing at more than $75 an hour.

Reasonable fees have generally been determined by reference to the prevailing market rates for attorney services. *See National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1323 & n. 2 (D.C.Cir.1982) ("reasonable hourly rate ... [is] that prevailing in the community for similar work"). Under that standard, the $75 rate is well within reason. From defense counsel's representation and the court's own knowledge of the rates charged by attorneys in the Washington, D.C., area, $75 appears to be a fair—even low—rate for someone of defense counsel's experience.

The reasonableness of the $75 rate is also supported by the attorney's actual performance. Defense counsel discharged his responsibilities in an expert and diligent fashion. He took the case seriously from the start and attempted to resolve it as quickly as possible; he complied with all the court's rules and orders;[4] he attempted

to obtain cooperation from opposing counsel and turned to the court for assistance only when his efforts proved unsuccessful. Altogether, defense counsel rendered an exemplary performance, serving both his client and the interests of justice well.[5]

### Conclusion

Plaintiff has brought and pursued this action in bad faith. Defendant is entitled to recover fees for 150 hours of attorney's time at $75 per hour, less the $350 previously awarded[6] for a total of $10,900. 28 U.S.C. § 2412(b) (Supp. V 1981). Defendant shall also have its costs. *Id.* § 2412(a); RUSCC 54(d).

principally punitive rather than compensatory. *See Chee v. Schweiker*, 563 F.Supp. 1362, 1365 (D.Ariz.1983).

---

4. Counsel was particularly conscientious as to motions for enlargement of time. All such motions were submitted well in advance of the pertinent filing deadlines and met the other requirements enumerated in *Whorton v. United States*, 1 Cl.Ct. 41 (1982).

5. The fact that defense counsel is a salaried employee of the Department of Justice and thus does not bill his clients by the hour is of no consequence where, as here, the fee award is

6. The list of activities for which defendant is seeking attorney's fees includes items for which it has already received some reimbursement. The amount previously paid must therefore be subtracted from the current award to avoid dual compensation.